1
2
3
4
5
6                    IN THE UNITED STATES DISTRICT COURT
7                  FOR THE NORTHERN DISTRICT OF CALIFORNIA
8
9
10   BOON RAWD TRADING                        No. C 09-05617 WHA
     INTERNATIONAL CO., LTD.,
11
            Plaintiff,                        **ORDER GRANTING IN PART
12                                            AND DENYING IN PART
        v.                                    COUNTERDEFENDANT'S
13                                            MOTION TO DISMISS AND
     PALEEWONG TRADING CO., INC.,             VACATING HEARING**
14
            Defendant.
15   _____/
16   AND RELATED COUNTERCLAIMS.
     _____/
17
18                            **INTRODUCTION**
19          In this contractual beer brawl involving the exclusive importation rights for Singha Beer,
20   the crisp and refreshing "original premium Thai beer," plaintiff and counterdefendant Boon Rawd
21   Trading International Co., Ltd. ("BRTI") moves to dismiss seven counterclaims asserted by
22   defendant and counterclaimant Paleewong Trading Co., Inc. ("PTC").  For the reasons set forth
23   below, the motion must be **GRANTED IN PART** and **DENIED IN PART**.
24                             **STATEMENT**
25          Boon Rawd Sreshthaputra was born in Thailand in 1872.  Schooled by his father until he
26   was eleven years old, he was then sent away to be educated by Buddhist monks, as was custom at
27   the time for young Thai men.  His working career began humbly, first as a teacher in his teenaged
28   years, and then as a clerk at the British-owned logging company, A.J. Dickson.  After a lengthy

**United States District Court**
For the Northern District of California

United States District Court

For the Northern District of California

career in the logging industry, Sreshthaputra bet his dreams on entrepreneurship, starting a small ferry company to transport Bangkokians across the Chao Praya river between the cities of Bangkok and Thonburi.  He faced stifling competition, first from rival ferrymen, and then from industrious bridge builders.  In 1929, his ferry business underwater, Sreshthaputra abandoned his ships and turned to alcohol.  Brewing, that is.  After honing his skills in the tradition-soaked beer halls of Germany and Denmark, the first bottle of Singha Beer rolled off the assembly line at Boon Rawd Brewery in 1933.  Thailand's oldest and most popular beer was launched.[1]

Plaintiff and counterdefendant BRTI is a Thai corporation and wholly owned subsidiary of Singha Corporation Co., Ltd., which is owned in its entirety by Boon Rawd Brewery Co., Ltd., the original family brewery founded by Boonrawd Sreshthaputra over 75 years ago (Compl. ¶ 7).  Today, BRTI exports Singha Beer to over 37 countries around the world, including the United States (*ibid.*).  Defendant and counterclaimant PTC, a New York corporation, began serving as a U.S. importer and distributor of Singha Beer in the 1970s, eventually becoming the *only* importer and distributor of Singha Beer in the United States (*id.* ¶¶ 9, 10, 11).  The crux of this dispute is whether "only" in this context meant "exclusive."

This motion to dismiss targets seven counterclaims raised by PTC in its answer (Dkt. No. 6).  To be clear, plaintiff BRTI's complaint asserted only a single claim for declaratory relief, claiming that it had the right to freely terminate its relationship with PTC as an importer of Singha Beer (Compl. ¶¶ 20–23).  An important fact underlying both BRTI's claim and PTC's counterclaims in this dispute is that *there was never any written contract* evidencing the alleged "exclusive" agreement between the parties.  Rather, PTC alleged in its answer that a "course of conduct" formed the basis of such an agreement.  With this procedural posture set forth, the facts below are as alleged in PTC's answer and counterclaims.

According to PTC, it has been for the past 32 years the *exclusive* importer and distributor of products manufactured by Boon Rawd Brewery within a defined territory of 32 states (Ans. ¶ 27).  Singha Beer is the most significant of these products, all of which are encompassed by this

---

[1] Singha Corporation Co., Ltd. Home Page, History, http://www.boonrawd.co.th (last visited February 18, 2010).

United States District Court

For the Northern District of California

dispute.[2]  For the past 26 years, this exclusivity agreement also extended to portions of California and New York (*ibid.*).  In 2002, PTC alleged that BRTI began engaging in a "tactical scheme" to strip PTC of its exclusive importation rights by unilaterally encroaching into PTC's defined territory, appointing a subsidiary as a "dual importer" to compete with PTC, practicing price discrimination against PTC, misappropriating PTC's confidential proprietary information, unilaterally setting artificial sales goals, and accusing PTC of various improprieties expounded on later in this order (*id*. ¶ 28).

While PTC's answer alleged that it had exclusive importation rights to Boon Rawd products dating back to 1976, it bears noting that BRTI was *not* Boon Rawd Brewery's exporter of its products until 2000.  Prior to that date, a different entity, Rajvitee Co., Ltd., served as the exporter of Boon Rawd's products (*id*. ¶¶ 9–10, 39).  Nevertheless, PTC's answer alleged that in 1976, Boon Rawd Brewery — the parent company who is *not* a party to this action — appointed PTC as its *exclusive* U.S. importer and distributor for states straddling the east coast, including New York (*id*. ¶ 36).  This agreement purportedly included distribution rights within New York, as well as the right to appoint wholesalers and distributors in other states (*ibid.*).  PTC further alleged that in 1993, Boom Rawd Brewery appointed it as the exclusive importer and distributor in exclusive territories within California (*id*. ¶ 38).

When BRTI took over as the exporter of Boon Rawd products in 2000, PTC claimed that there was a "mutual understanding" between the parties that PTC would continue to serve as the exclusive importer and distributer of Boon Rawd products for the territories outlined above.  This mutual understanding was allegedly pursuant to an agreement created by the "course of conduct" between PTC and BRTI's predecessors-in-interest over the prior 25 years (*id*. ¶ 39).  Moreover, it supposedly was always "understood and agreed" between BRTI (and its predecessors) and PTC that PTC's importation rights could not be terminated without good cause (*id*. ¶ 40).  In the event that a termination of the agreement occurred, however, the agreement purportedly entitled PTC to "compensation for the value of [their] importation rights" (*ibid*.).

---

[2]  This order notes, however, that neither the complaint nor the answer mentions any Boon Rawd product other than Singha Beer.  However, the language used in both pleadings indicates that there are additional products at issue in this litigation.

United States District Court

For the Northern District of California

1    Despite this alleged exclusivity agreement, BRTI supposedly began a "tactical campaign"

2    in 2002 to diminish the value of PTC's importation rights, diminish PTC's profits, and create a

3    pretextual basis to terminate PTC's importation agreement for cause (*id.* ¶ 41).  As an example, in

4    2003, PTC claimed that BRTI formed Singha North America ("SNA") to (1) compete with PTC

5    as an importer and distributor of Boon Rawd products and (2) eventually *replace* PTC in the

6    exclusive territories it served (*id.* ¶ 42).  PTC made this claim despite BRTI's alleged

7    representation that the new entity would only import products into those territories that were *not*

8    serviced by PTC, and would *not* encroach into PTC's alleged exclusive territories (*id.* ¶ 43).[3]  In

9    sum, PTC alleged that SNA was formed by BRTI to eventually become the exclusive importer for

10   the entire United States (*id.* ¶ 44).

11    The answer further alleged that in 2003, PTC learned of BRTI's first attempt to terminate

12   its exclusive importation rights in California without good cause (*id.* ¶ 45).  Upon information and

13   belief, PTC alleged it was BRTI's intent to transfer these importation rights to SNA once they

14   were stripped from PTC (*ibid.*).  After discussions between the parties, however, BRTI

15   purportedly withdrew its termination notice because it had "no good cause" and the compensation

16   offered to PTC was neither "appropriate" nor "acceptable" (*id.* ¶ 46).  Over the next few years,

17   plaintiff allegedly re-attempted on numerous occasions to obtain PTC's exclusive importation

18   rights for a nominal sum.  These proposals, however, went unrequited (*id.* ¶¶ 47, 48).

19    BRTI then pursued a different approach.  In or around 2006, BRTI proposed that SNA and

20   PTC form a joint venture that would *share* importation rights to Boon Rawd products, while

21   leaving PTC with its exclusive distribution rights in their alleged exclusive territories (*id*. ¶ 49).

22   During the negotiation process, however, BRTI nevertheless began exporting its products to SNA

23   for distribution *within* defendant's exclusive territories (*id*. ¶ 51).  This produced considerable

24   ferment between the parties.  To assuage these concerns while negotiations continued, BRTI

25   represented to PTC that "the dual importing would not cause any problems . . . in light of the fact

26

27        [3] On this point, BRTI claimed that SNA was created to fill the void left by another
      former importer of Boon Rawd products, Paulaner North America.  Prior to SNA's creation,
28    Paulaner apparently imported Singha Beer into the territories that were not being
      "exclusively" served by PTC (Ans. ¶¶ 43).

4

that the joint venture would soon be completed" and that PTC "would benefit from these sales" being consummated by SNA (*id.* ¶ 51). Additionally, BRTI allegedly promised PTC that SNA would only sell Boon Rawd products to *one* distributor in California — Young's Market — who in turn would only be permitted to sell the products to limited number of accounts, none of which belonged to PTC (*id.* ¶ 52). PTC claimed that it relied upon these representations by BRTI and, in the interests of finalizing the joint venture agreement, did not protest these sales (*id.* ¶ 53). Despite these representations, SNA supposedly began competing *directly* with PTC in California, selling to two of PTC's sub-distributors. Additionally, Young's Market began distributing Boon Rawd products to accounts being served by PTC (*id.* ¶ 54). Finally, the answer alleged that SNA — who is *not* a party to this action — hired a key PTC employee in 2006 to enable itself to compete in California, and that BRTI misappropriated PTC's confidential proprietary information and provided it to SNA (*id.* ¶¶ 55, 56). These acts supposedly were performed by BRTI and SNA in furtherance of aforementioned "tactical campaign" to strip PTC of its importation rights by "making the brand less valuable to [PTC]" (*id.* ¶ 57).

After good faith negotiations ended in 2006, BRTI refused to go forward with the joint venture it had originally proposed (*id.* ¶ 50). According to defendant, BRTI — recognizing that it could not simply terminate defendant's exclusive agreement to import Boon Rawd products in California and New York — then offered to purchase defendant's importation rights for $3 million. This offer by BRTI allegedly left PTC's distribution rights intact in California and New York, and left in place all prior agreements between the parties involving logistical, brokerage, marketing, advertising, and product promotion services. On December 14, 2006, the parties allegedly executed a Memorandum of Understanding evidencing this agreement (*id.* ¶ 58).

In July 2007, however, after the parties had negotiated the terms of this agreement in good faith, BRTI purportedly refused to go forward with the transaction without cause or explanation (*id.* ¶¶ 59, 60). Following this unilateral cessation of negotiations, PTC alleged that BRTI renewed its efforts to pressure PTC out of the import business through various tactics it employed with SNA, including: (1) improper pricing practices, (2) continuing to allow SNA to import Boon

United States District Court

For the Northern District of California

United States District Court

For the Northern District of California

1    Rawd products into California, (3) fabricating complaints about PTC, and (4) making

2    unreasonable demands on PTC (*id.* ¶ 61).

3         A final round of negotiations occurred in 2008, involving the same basic terms set forth in

4    the December 14 agreement (*id.* ¶ 62).  During these discussions, however, PTC allegedly

5    discovered that SNA was selling Boon Rawd products to distributors in California at below the

6    *cost* that BRTI was selling those same products to PTC (*id.* ¶ 63).  Around this time, BRTI

7    allegedly increased its criticism of PTC by accusing it of "not developing the off-premise market"

8    for Boon Rawd products, despite PTC's opinion that it was BRTI's *own* pricing scheme that had

9    made these products uncompetitive in that market (*id.* ¶ 64).[4]  While negotiations continued into

10   2009, PTC did not agree to sell its importation rights due to concerns that its business would not

11   be sustainable as a distribution-only operation (*id.* ¶ 65).  Finally, BRTI sent PTC a notice on

12   August 20, 2009, advising PTC that its importation rights to Boon Rawd products would be

13   terminated effective December 31, 2009 (*id.* ¶ 66).

14        According to PTC, this purported termination was without good cause.  On this issue,

15   BRTI supposedly *agreed* with PTC that it was entitled to reasonable compensation for the

16   termination of its importation rights, and requested that PTC submit an offer (*id.* ¶ 67).  In

17   response, PTC requested that the parties sign a confidential non-disclosure agreement prior to

18   such a submission.  The request was refused (*id.* ¶¶ 68, 69).  PTC then made an offer to BRTI on

19   August 29, 2009 (*id.* ¶ 70).  As an apparent rejection of the offer, BRTI proceeded to file this civil

20   action on November 30, 2009 (*id.* ¶¶ 71, 72; Dkt. No. 1).  Shortly thereafter, BRTI indicated to

21   PTC that it would be terminating PTC's importation rights effective December 31, 2009, just as it

22   had advised months before (Ans. ¶ 72).

23   **ANALYSIS**

24        To survive a motion to dismiss for failure to state a claim, a pleading must contain

25   sufficient factual matter, accepted as true, to state a claim that is plausible on its face.  FRCP

26

27       [4] The "off-premise" market for Boon Rawd products included liquor and chain stores
28   (*i.e.* establishments where the product was purchased and consumed off-site).  By contrast, the "on-premise" market included retail establishments where the product was consumed at the point of purchase, such as restaurants (Compl. ¶ 14).

12(b)(6); *Ashcroft v. Iqbal*, — U.S. —, 129 S. Ct. 1937, 1949 (2009).  A claim is facially plausible when there is sufficient factual content to draw a reasonable inference that the defendant (or in this motion, the counterdefendant) is liable for the misconduct alleged.  While the Court "must take all of the factual allegations in the complaint as true," it is "not bound to accept as true a legal conclusion couched as a factual allegation." *Id.* at 1949–50.  "[C]onclusory allegations of law and unwarranted inferences are insufficient to defeat a motion to dismiss for failure to state a claim." *Epstein v. Wash. Energy Co.*, 83 F.3d 1136, 1140 (9th Cir.1996).

PTC, in its answer, raised eight counterclaims against BRTI (Ans. ¶¶ 14–21):

1.   Breach of implied contract due to BRTI's termination of PTC's importation rights on December 31, 2009;

2.   Breach of implied contract due to the "dual importation" of Boon Rawd products by BRTI beginning in 2006;

3.   Intentional interference with prospective economic advantage;

4.   Breach of implied covenant of good faith and fair dealing;

5.   Promissory estoppel;

6.   Conversion of defendant's import rights and goodwill;

7.   Unjust enrichment; and

8.   Violation of the California Franchise Relations Act (Cal. Bus. & Prof. Code Section 20000, *et seq.*).

BRTI targets all but the first of PTC's counterclaims in the instant motion.  These counterclaims will now be addressed in turn.

**1.   COUNTERCLAIM TWO:  BREACH OF IMPLIED CONTRACT**

PTC's second counterclaim alleged that "beginning in 2006 and thereafter," BRTI exported Boon Rawd products to SNA for distribution in the United States in violation of PTC's purportedly exclusive importation and distribution rights, thereby constituting a breach of an implied contractual agreement (Compl. ¶¶ 83–91).  The instant motion brought by BRTI focuses solely on whether this "dual importation" counterclaim (as referred to in the answer) is time-barred under the applicable statute of limitations.

The parties agree that a two-year limitations period applies to this counterclaim (Br. 5–7, Opp. 7).  *See* Cal. Code Civ. Proc. § 339 (providing that a two-year statute of limitations applies

7

**United States District Court**
For the Northern District of California

1   to actions "upon a contract, obligation or liability not founded upon an instrument in writing").

2   The parties disagree, however, on (1) whether the counterclaim accrued in 2006, (2) whether

3   BRTI is equitably estopped from asserting a statute of limitations defense, and (3) whether the

4   doctrine of contractual severability applies to this action and preserves PTC's right to relief.

5         A.    ACCRUAL OF COUNTERCLAIM TWO

6         For state law claims in federal court, state statutes of limitations, including their tolling

7   rules, are "substantive" for *Erie* purposes. *Guaranty Trust Co. of New York v. York*, 326 US 99,

8   110 (1945). Under California law, a cause of action must be brought in state court within the

9   limitations period after it has accrued. Cal. Code Civ. Proc. § 312. A cause of action accrues at

10  "the time when the cause of action is complete with all of its elements." *Norgart v. Upjohn Co.*,

11  21 Cal. 4th 383, 397 (1999). An important exception to this rule of accrual, however, is the

12  "discovery rule," which postpones accrual until the plaintiff discovers, or has reason to discover,

13  the facts underlying the cause of action. *Ibid.*

14        In its answer, PTC alleged that BRTI began dual importing into its exclusive territory

15  during negotiations in 2006 (Ans. ¶¶ 51, 88). Furthermore, PTC admitted that *during* these

16  negotiations, it brought to BRTI's attention it's concerns that such "dual importation" was

17  occurring (*id.* ¶¶ 52, 88). Indeed, PTC's opposition concedes that it knew in 2006 that BRTI had

18  been engaging in "dual importation" — the very act that forms the basis for its second

19  counterclaim (Opp. 4). As such, PTC cannot avail itself of the "discovery rule" to postpone

20  accrual of its second breach of implied contract counterclaim.

21        In its opposition, PTC raises the argument that because there existed "ongoing contractual

22  obligations" between the parties at the time BRTI first breached the exclusive importation

23  agreement in 2006, it was *not* required to assert its counterclaim for breach of implied contract by

24  2008. Rather, PTC asks the Court to find that the statute of limitations *did not even begin to run*

25  until it elected to treat the implied contract as terminated, which was at the end of 2009 (Opp. 12).

26  To support this argument, PTC cites to *Romano v. Rockwell Int'l, Inc.*, 14 Cal. 4th 479 (1996),

27  which addressed whether an employee's claim for wrongful termination against his employer

28  accrued on the date of his termination or on the date the employee was notified that his

**United States District Court**
For the Northern District of California

employment was going to be terminated.  In *Romano*, the court held that "because Romano continued to perform and accept compensation until the time of actual termination," this "reflect[ed] an election to treat the [employment] contract as still in effect."  *Romano*, 14 Cal. 4th at 490.  As such, the court determined that the statute of limitations period should have been measured from the date of the employee's termination, since "the [p]laintiff should not be penalized for leaving to the defendant an opportunity to retract his wrongful repudiation."  *Id.* at 489 (citation omitted).  The *Romano* court went further to state that "whether [a] breach is anticipatory or not, when there are ongoing contractual obligations the plaintiff may elect to rely on the contract despite a breach, and the statute of limitations does not begin to run until the plaintiff has elected to treat the breach as terminating the contract."  *Id.* at 490.  PTC also cited *Lambert v. Commonwealth Land Title Ins. Co.*, 53 Cal. 3d 1072, 1078 (1991)*,* which applied a similar rule to a breach of duty claim against a title insurance company.

Neither *Romano* nor *Lambert* apply here.  In *Romano*, the court's primary concern was ensuring that an employee was not penalized for affording his employer the opportunity to retract a wrongful repudiation before the actual date of termination.  *See Romano*, 14 Cal. 4th at 489.  Indeed, the *Romano* court expressly recognized the option of plaintiff to "treat the repudiation as an empty threat, wait until the time for performance arrives and exercise his remedies for *actual breach* if a breach does in fact occur at such time."  *Ibid.* (citations omitted) (emphasis added).  The *Lambert* decision was reached on similar grounds.  *See Lambert*, 53 Cal. 3d at 1074–77 (holding that the title holder could wait "until a final judgment had been entered and [his insurer's] duty to defend had ceased," because the title insurer "could have assumed [this duty] at any time . . . before final judgment").  Here, the alleged "dual importation" conducted by BRTI in 2006 was not an empty threat, but rather an actual and material breach of the importation agreement's most important provision: exclusivity.  Additionally, since the alleged agreement between PTC and BRTI was open-ended, there was no specific point in time — or "time for performance" as explained in *Romano* — where the parties could definitively gauge whether an

actual breach "d[id] in fact occur."  Indeed, an actual breach had already occurred in 2006, as readily admitted in PTC's answer.[5]

In sum, PTC asks the Court to (1) ignore PTC's admitted knowledge of BRTI's actual breach of the alleged exclusivity agreement in 2006 and (2) toll the statute of limitations *indefinitely* until the date PTC elected to treat the breach as terminating the contract.  If this were really the rule, had BRTI not terminated the contract itself in 2009, PTC could have waited fifty years before filing this action, and would be entitled to the full fifty years worth of damages.  This is not the law in California, and not the rule contemplated by *Romano*.  It would lead to absurd and inequitable results.  As such, this order finds that PTC's second counterclaim accrued in 2006.

B.    EQUITABLE ESTOPPEL

In its answer, PTC — perhaps anticipating a statute of limitations defense — alleged that BRTI's conduct in 2006 (and thereafter) prevented it from filing its second counterclaim within the limitations period (Ans. ¶¶ 88, 89).  BRTI targets this equitable estoppel argument in its motion (Br. 5–8).

To preserve its second counterclaim under a theory of equitable estoppel, PTC must allege sufficient facts establishing the following four elements:  (1) the party to be estopped must be apprised of the facts; (2) he must intend that his conduct shall be acted upon, or must so act that the party asserting the estoppel has a right to believe it was so intended; (3) the other party must be ignorant of the true state of facts; and (4) he must rely upon the conduct to his injury."  *Strong v. County of Santa Cruz*, 15 Cal. 3d 720, 725 (1975).  Additionally, while "[a]n estoppel may arise" absent a "designed fraud on the part of the person sought to be estopped," the statement or conduct at issue "must amount to a misrepresentation bearing on the *necessity* of bringing a timely suit," and any reliance on the misrepresentation must be reasonable.  *Lantzy v. Centex Homes*, 31 Cal. 4th 363, 384 n.18 (2003) (emphasis added).

---

[5]  PTC's citation to Witkin on this point is similarly inapposite (Opp. 11).  The excerpt from Witkin referred specifically to delaying accrual to "the time for final performance" and "the date when the last performance is due."  Here, the alleged implied contract extended into perpetuity, with no final or last performance date contemplated.

United States District Court

For the Northern District of California

*First*, there can be no doubt that PTC knew "the true state of facts" underlying its second counterclaim in 2006 to bring this counterclaim within the limitations period.  In its answer, PTC alleged that it "did not protest the dual importation of Boon Rawd [p]roducts based upon BRTI's misrepresentations that BRTI would promptly complete the joint venture it was negotiating with [defendant] pursuant to which the import rights in the United States would be owned by the joint venture company and that SNA would not sell products to [defendant's] customers" (Ans. ¶ 88).  As discussed in the prior section on accrual, BRTI's "dual importation" conduct is the basis for PTC's second breach of contract counterclaim.

*Second*, the alleged misrepresentation — as least based upon the facts as pled — was not a statement bearing on the *necessity* of bringing a timely suit.  Indeed, the alleged misrepresentation had nothing to do with whether the exclusivity agreement between the parties had been breached.  Rather, BRTI represented to PTC that "the dual importing would not cause any problems for [PTC], in light of the fact that the joint venture would soon be completed, and [PTC] would then benefit from these sales" (*id.* ¶ 52).  While PTC alleged that these representations were contrary to BRTI's true intentions and conduct, and that it relied upon BRTI's statements by choosing to "not protest the dual importation," this cannot form the basis of an equitable estoppel argument (*id.* ¶¶ 48, 52, 54, 89).

One reason for this conclusion is that the above negotiations, whether fraudulently motivated or not, failed in 2006, well within the two-year limitations period (*id*. ¶ 50).  While the parties may have engaged in subsequent negotiations, those renewed negotiations apparently ended in July 2007 (*id.* ¶¶ 58–60).  A third round of negotiations between the parties did not resume until 2008 (*id.* ¶ 62).  Taking these facts as true, plaintiff clearly had the opportunity — at least during the period between July 2007 and 2008 — when *no negotiations* were occurring to bring its second counterclaim within the limitations period.

A second reason for barring the application of equitable estoppel is that PTC discovered in 2006 that BRTI's representations allegedly made during negotiations were false (*id.* ¶ 54).  Thus, even if BRTI's misrepresentations could have formed the basis of an equitable estoppel argument, PTC ceased being "ignorant of the true state of facts" in 2006, will within the limitations period.

Finally, it must be noted that PTC, after learning that BRTI had breached its purportedly exclusive importation agreement, knowingly made the *business decision* to pursue a mirage of riches — the proposed joint venture with SNA — rather than enforce its rights under the contract. While BRTI may have misrepresented its willingness to pursue such a venture, PTC was never bound to entertain such an offer. In the end, negotiations failed. Given these alleged facts, it would seem an improper application of equitable estoppel when BRTI made no statements bearing upon the *necessity* of PTC to bring a timely suit. Rather, BRTI simply offered a more lucrative *deal*, which PTC — with dollar signs in its eyes — elected to pursue.

For these reasons, equitable estoppel cannot apply to this counterclaim.

C.    SUCCESSIVE BREACH AND CONTINUOUS ACCRUAL

PTC's third and final argument with respect to BRTI's statute of limitations defense invokes the theories of successive breach and continuous accrual (Opp. 11). While PTC admits that dual importing of Boon Rawd products first occurred in 2006, it asserts that BRTI "resumed its dual importing in California in 2007 and 2008" and 2009 (*ibid.*). Citing no law, defendant then argues that these additional allegations of dual importing are sufficient to demonstrate successive breaches of the parties' implied contract, and that it is entitled to bring its second counterclaim for conduct occurring within the two years prior to its filing its answer.

This argument is both factually and legally deficient. *First*, PTC's answer says *nothing* about BRTI resuming its dual importing activities in California in the years mentioned above. Rather, PTC's answer clearly states that in 2007, BRTI "continu[ed] to dual import in California" (Ans. ¶ 61). Indeed, nowhere in the answer is it alleged that BRTI ever *ceased* engaging in dual importation after beginning the practice in 2006. Thus, this order does not find that "successive breaches" of the purported contract have been alleged. *Second*, the alleged facts do not support the applicability of continuous accrual. As explained by BRTI in its reply brief, whether PTC can recover for any breaches of the purported exclusive importation agreement within the two year period preceding the filing of its counterclaims hinges upon the doctrine of contractual severability (Reply 2–3). *Armstrong Petroleum Corp. v. Tri-Valley Oil & Gas Co.*, 116 Cal. App. 4th 1375, 1388–89 (2004). In *Armstrong*, the California Supreme Court noted that "[w]here a

12

United States District Court

For the Northern District of California

contract is divisible and, thus, breaches of its severable parts give rise to separate causes of action, the statute of limitations will generally begin to run at the time of each breach; in other words, each cause of action for breach of a divisible part may accrue at a different time for purposes of determining whether an action is timely under the applicable statute of limitations." *Ibid.* (citation omitted).  Typical examples of severable contracts are installment contracts, periodic rental payments, and "contracts calling for periodic, pension-like payments on an obligation with no final and fixed amount." *Id.* at 1388.

The *Armstrong* court cautioned, however, that the context of continuing accrual for periodic breach "is to be distinguished from that of a single breach or other wrong which has continuing impact." *Id.* at 1389 (citations omitted).  Additionally, "[i]f the parties to its making intend an entire contract, not a severable one, the courts will not find it divisible despite periodic performance." *Ibid.*  Here, there is no indication in the facts alleged that the purported exclusive importation agreement was severable, or that the parties intended it to be.  Furthermore, there is no indication how payments or shipments under the contract were handled.  In other words, PTC has not alleged any facts to support a finding that the implied contract involved "a periodic procedure for the performance of their respective obligations." *Id.* at 1390.  Had PTC done so, breaches that occurred within the limitations period might *not* be barred.

Absent a sufficient factual basis to determine whether the implied contract can be treated as severable, BRTI's motion to dismiss PTC's second counterclaim must be **GRANTED**, and PTC's second counterclaim is hereby **DISMISSED**.

> **2.    COUNTERCLAIM THREE:  INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE**

In counterclaim three, PTC alleged "a scheme and pattern of tortious conduct" that purportedly began in 2003 with the formation of SNA and continued through the commencement of this action (Opp. 13; Ans. ¶¶ 42–45, 51, 52, 54, 56, 86, 87).  As with the prior counterclaim, BRTI argues that a two-year limitations period bars PTC's third counterclaim for the tort of intentional interference with prospective economic advantage (Br. 8).

PTC does not dispute that a two-year limitations period applies to this tort (Opp 13).  *See* Cal. Code Civ. Proc. § 339.  Rather, PTC argues that the facts as alleged in its answer set forth a

"continuing wrong," and therefore "the statute of limitations does not begin to run until the date of the last injury or when the tortuous [sic] acts cease." *Pugliese v. Superior Court*, 146 Cal. App. 4th 1444, 1452 (2007). What PTC fails to mention, however, is that *Pugliese* — the decision upon which it relies for this argument — involved the statutory tort of domestic violence, and entailed an extensive analysis of the related California code provisions setting forth specific rules governing its accrual. *Id.* at 1448–49. Indeed, based upon an examination of California decisions that have applied the "continuing tort" doctrine, none have extended the doctrine to the tort of intentional interference with prospective economic advantage.[6] Given that PTC has alleged numerous discrete acts to support this counterclaim, including price discrimination, dual importation, misappropriation of confidential information, and fabricating complaints, there is no basis to treat these acts as a single, continuous wrong. As such, the undersigned declines to extend the continuing tort doctrine to this counterclaim.

This, however, does not end the analysis. Given the discrete nature of the alleged wrongful acts underlying its third counterclaim, PTC *may* bring its third counterclaim for any allegedly wrongful act committed within the two-year limitations period. *See Reeves v. Hanlon*, 33 Cal. 4th 1140 (2004) (the tort of intentional interference with prospective economic advantage requires, among other things, proof that the defendant committed an act of interference that was wrongful by some legal measure other than the fact of interference itself). Given that at least some of the accused acts purportedly fell within the limitations period — *e.g.* the price discrimination that purportedly occurred in 2008 — this counterclaim as to those acts is not time-barred (Ans. ¶ 63). In sum, BRTI's motion on this counterclaim with respect to alleged wrongful acts committed prior to December 21, 2007, is **GRANTED**.[7] This includes the act of dual importation, since its wrongfulness stems from the alleged breach of contract claim that accrued in 2006. Conversely, the motion with respect to acts that occurred on or after December 21, 2007, must be **DENIED**.

---

[6] As BRTI's reply brief correctly points out, the "continuing tort" doctrine is raised almost exclusively in disputes involving continuing nuisances or trespasses (Reply 6).

[7] PTC filed its answer on December 21, 2009 (Dkt. No. 6).

United States District Court

For the Northern District of California

### 3. COUNTERCLAIM FOUR: BREACH OF IMPLIED COVENANT OF GOOD FAITH & FAIR DEALING

Echoing its prior arguments, BRTI again asserts that a two-year limitations period bars PTC's counterclaim (Br. 8–9). As before, there is no dispute that a two-year limitations period applies to this counterclaim (Opp. 14–15). With respect to its fourth counterclaim, however, it is clear that PTC has sufficiently alleged discrete acts falling within the two-year limitations period for this counterclaim, most obviously the termination of the importation agreement between the parties in 2009 "without just cause" (Ans. ¶ 99). As such, BRTI's motion with respect to alleged breaching conduct committed prior to December 21, 2007, is **GRANTED**. Conversely, the motion with respect to alleged breaching conduct that occurred on or after December 21, 2007, must be **DENIED**.[8]

### 4. COUNTERCLAIM FIVE: PROMISSORY ESTOPPEL

Rather than raise a statute of limitations argument, BRTI attacks PTC's promissory estoppel counterclaim on its merits. Promissory estoppel requires: (1) a promise that is clear and unambiguous in its terms; (2) reliance by the party to whom the promise is made; (3) the reliance must be reasonable and foreseeable; and (4) the party asserting the estoppel must be injured by his or her reliance. *Ecology, Inc. v. State of California*, 129 Cal. App. 4th 887, 901-902, 904 (2005). The purpose of this doctrine is to make a promise that lacks consideration (in the usual sense of something bargained for and given in exchange) binding under certain circumstances. *Youngman v. Nevada Irrigation District*, 70 Cal. 2d 240, 249 (1969).

With respect to its fifth counterclaim, PTC alleged that (Ans. ¶ 102):

> In order to induce [PTC] to become and remain the exclusive importer for Boon Rawd [p]roducts and to actively develop the market for such products, the Brewery and BRTI, by their statements and their conduct, expressly and impliedly made clear and definite promises to [PTC], including without limitation, that (i) [PTC] would be granted exclusive territories, (ii) [PTC] would not be terminated as the exclusive importer without good cause; and (iii) in the event [PTC] was terminated without good cause, [PTC] would receive reasonable compensation for its importation rights to the Boon Rawd [p]roducts which it developed.

---

[8] PTC raised the same argument under *Romano* — that the statute of limitations did not even begin to run until 2009 — that it raised for its second counterclaim (Opp. 15). For the same reasons set forth earlier in this order, that argument is rejected.

15

**United States District Court**
For the Northern District of California

1    Additionally, PTC claimed that it reasonably and foreseeably relied to its detriment upon these

2    alleged representations by developing and building the market for Boon Rawd products, investing

3    "considerable time, effort and money" in the process (*id.* ¶¶ 103–106).

4         The doctrine of promissory estoppel is only applicable when an alleged promise lacks

5    adequate consideration. *Youngman*, 70 Cal. 2d at 249.  In its motion, BRTI focuses on this

6    requirement and contends that PTC's fifth counterclaim fails as a matter of law because the

7    purported detrimental reliance alleged by PTC — its development of a market for Boon Rawd

8    products — was nothing more than the very performance requested by BRTI under the alleged

9    implied agreement (Br. 9–10).  In other words, under the facts alleged by PTC, the promises made

10   by BRTI were bargained for and given in exchange for performance.  Since this means that there

11   *was* consideration, there can be no claim for promissory estoppel.

12        This argument is supported by the longstanding rule that "[i]f the promisee's performance

13   was requested at the time the promisor made his or her promise and that performance was

14   bargained for, the doctrine of promissory estoppel is inapplicable." *Healy v. Brewster*, 59 Cal. 2d

15   455 (1963); *Youngman*, 70 Cal. 2d at 249–50; *Raedeke v. Gibraltar Sav. & Loan Assn.*, 10 Cal. 3d

16   665 (1974); *Signal Hill Aviation Co. v. Stroppe*, 96 Cal. App. 3d 627 (1979).  Here, PTC clearly

17   alleged in its answer that BRTI's various promises pertaining to exclusivity were made "to induce

18   [PTC] to become and remain the exclusive importer for Boon Rawd [p]roducts *and to actively*

19   *develop the market for such products*" (Ans. ¶ 102).  PTC then alleged that it did, in fact, develop

20   the market for Boon Rawd products to its supposed detriment (*id.* ¶¶ 103–106).

21        Under *Healy* and its progeny, this performance by PTC *to its detriment* constituted

22   adequate consideration for the alleged promises made by BRTI.  59 Cal. 2d at 463.  As such,

23   since the presence of adequate consideration renders the doctrine of promissory estoppel

24

25

26

27

28

16

United States District Court

For the Northern District of California

1    inapplicable, BRTI's motion with respect to this counterclaim must be **GRANTED**.[9]  PTC's fifth

2    counterclaim is therefore **DISMISSED** without leave to amend.

3        **5.    COUNTERCLAIM SIX:  CONVERSION**

4        In another merits-based attack, BRTI argues that PTC's conversion counterclaim must be

5    dismissed as a purported "conversion of intangible goodwill," which is not actionable under

6    California law (Br. 10-12).

7        Under California law, a claimant must plead three elements to state a claim for

8    conversion: (1) ownership or right to possession of personal property; (2) a defendant's wrongful

9    interference with the claimant's possession; and (3) damage to the claimant.  *PCO, Inc. v.*

10   *Christensen, Miller, Fink, Jacobs, Glaser, Weil & Shapiro, LLP*, 150 Cal. App. 4th 384, 394

11   (2007).  While early California cases expressly held that an intangible interest such as customer

12   goodwill cannot be the subject of a claim for conversion, later cases merely held that an

13   intangible interest must be "merged with, or reflected in, something tangible."  *Compare Adkins*

14   *v. Model Laundry Co.*, 92 Cal. App. 575, 583 (1928) and *Olschewski v. Hudson*, 87 Cal. App.

15   282, 288 (1927) *with Thrifty-Tel, Inc. v. Bezenek*, 46 Cal. App. 4th 1559, 1565 (1996).  Notably,

16   the Ninth Circuit recently held that to the extent "California retains some vestigial merger

17   requirement, it is clearly minimal, and at most requires only some connection to a document or

18   tangible object."  *Kremen v. Cohen*, 337 F.3d 1024, 1033 (9th Cir. 2003) (internal quotations and

19   citations omitted).

20       Despite the clear trend that intangible property *can* be the subject of conversion, BRTI

21   nevertheless asserts that the longstanding law in California is that customer goodwill *cannot* be

22   the subject of conversion (Br. 11).  Indeed, BRTI is correct in that there are no published cases

23   that have held that goodwill can be the subject of a claim for conversion, under even the more

24   permissive modern line of cases.

---

25

26       [9]  The *Healy* decision provides the clearest explanation as to why promissory estoppel
     is inapplicable when a promise is made in exchange for performance.  Under such

27   circumstances, the only reliance that can make the promisor's failure to perform actionable is
     the promisee's doing what was requested.  If that reliance was detrimental, it would
     constitute consideration for the promise, thereby rendering promissory estoppel inapplicable.

28   If it was not detrimental, it would not constitute consideration, but it would fail to satisfy an
     essential element of promissory estoppel.  *Healy*, 59 Cal. 2d at 463.

United States District Court

For the Northern District of California

1    Perhaps cognizant of the rule set forth in *Kremen*, however, PTC argues that its claim for

2    conversion of goodwill is sufficiently connected to tangible assets "including but not limited to its

3    tangible detailed sales information, account level, name, volume, pricing, and delivery

4    information" (Ans. ¶ 111).  Unsurprisingly, BRTI counters that this "conclusory allegation" does

5    not evidence an actual relationship between the tangible and intangible property interests, and is

6    inconsistent with the law (Reply 9).  Although this issue — given the clearly shifting nature of

7    conversion law outlined above — is a close one, the undersigned declines to extend the tort of

8    conversion to customer goodwill.  Unlike the domain name at issue in *Kremen* or net operating

9    loss at issue in *Freemont Indemnity Co. v. Freemont General Corp.*, 148 Cal. App. 4th 97 (2007),

10   the goodwill of a business is a highly abstract property interest that does not lend itself to the

11   elements of conversion.  Indeed, it is difficult to fathom how one could determine whether a

12   defendant wrongfully interfered with the claimant's possession of such abstract property.

13   This does not end the inquiry, however, as counterclaim six also states a claim for

14   conversion of PTC's import rights.  Like goodwill, however, importation rights is an intangible

15   asset that has not traditionally been subject to conversion.  Rather, it is an intangible *contractual*

16   right protected under contract law, not tort law.  Moreover, no California case has ever allowed a

17   conversion claim for contractual rights to importation.  PTC's counterclaim for conversion of its

18   import rights is therefore dismissed for the same reasons as stated above.

19   In sum, BRTI's motion as to counterclaim six must be **GRANTED**, and PTC's sixth

20   counterclaim is **DISMISSED**.

21   **6.    COUNTERCLAIM SEVEN:  UNJUST ENRICHMENT**

22   Returning again to statutes of limitations, plaintiff argues that counterclaim seven fails to

23   state a claim because it is time barred by CCP § 339(1) (Br. 12).  Additionally, in its reply brief,

24   BRTI asserts that there is no cause of action for unjust enrichment in California (Reply 10).  As

25   the latter argument is an alternative basis for dismissal, which was not briefed by PTC, it will be

26   addressed last.

27   A.    APPLICABLE STATUTE OF LIMITATIONS

28

United States District Court

For the Northern District of California

Unlike counterclaims two through four, the parties disagree over the limitations period that should apply to counterclaim seven. As with other claims, BRTI asserts that a two-year limitations period applies under CCP § 339(1). PTC, however, states that unjust enrichment is subject to a three-year limitations period for "fraud or mistake" as set forth in CCP § 338(d).

There is no dispute that Section 338(d) provides a three-year statute of limitations for "[a]n action for relief on the ground of fraud or mistake." Puzzlingly, however, PTC does not explicitly allege *any* fraudulent act or mistake in its seventh counterclaim, even though it is clearly required for Section 338(d) to apply. Nor are there any facts pleaded with particularity that indicate that fraud or mistake apply. Given this absence, the two-year statute of limitations under CCP § 339(1) must apply.

B.     CONTINUING TORT DOCTRINE

As with counterclaim three, PTC invokes the continuing tort doctrine for the proposition that the statute of limitations did not begin to run until BRTI terminated PTC's importation rights on December 31, 2009. As this argument is identical to the one discussed under counterclaim three, above, its resolution is the same. Given that PTC has alleged numerous discrete acts to support this counterclaim, including price discrimination, dual importation, misappropriation of confidential information, and setting artificial sales goals, there is no basis to treat these acts as a single, continuous wrong. As such, the undersigned declines to extend the continuing tort doctrine to counterclaim seven.

That said, as with counterclaim three, there is no question that PTC sufficiently alleged that BRTI committed numerous allegedly wrongful acts within two years of the filing of PTC's answer on December 21, 2009. Given the discrete nature of these alleged wrongful acts committed by BRTI, this order finds that PTC is not barred from bringing its seventh counterclaim for any allegedly wrongful act committed within the two-year limitations period.

C.     UNJUST ENRICHMENT

While arguments first made in reply briefs are typically disregarded, BRTI makes the argument that there is no cause of action for "unjust enrichment" in California (Reply 10). This is true. Indeed, unjust enrichment is "not a cause of action . . . or even a remedy, but rather a

general principle, underlying various legal doctrines and remedies.  It is synonymous with restitution." *McBride v. Boughton*, 123 Cal. App. 4th 379, 387 (2004).  As such, a claim for unjust enrichment is properly pled as a claim for a contract implied-in-law.  It "does not lie when an enforceable, binding agreement exists defining the rights of the parties." *Paracor Fin., Inc. v. Gen. Elec. Capital Corp.*, 96 F.3d 1151, 1167 (9th Cir. 1996).  California, however, recognizes an exception to the rule that unjust enrichment does not lie when an enforceable contract exists: "Restitution may be awarded in lieu of breach of contract damages when the parties had an express contract, but it was procured by fraud or is unenforceable or ineffective for some reason." *McBride*, 123 Cal. App. 4th at 388.

Given this backdrop, to properly state a claim, PTC would have had to either allege that the parties' rights were not squarely set out in a binding agreement, or allege that any express contract was procured by fraud or was ineffective for some reason.  Since PTC failed to properly state a claim for unjust enrichment under these standards, BRTI's motion to dismiss PTC's sixth counterclaim must be **GRANTED**.  As such, PTC's seventh counterclaim is **DISMISSED**.

### 7.   COUNTERCLAIM EIGHT – VIOLATION OF THE CALIFORNIA FRANCHISE RELATIONS ACT

With respect to counterclaim eight, BRTI argues that defendant failed to allege the required elements to state a claim under the California Franchise Relations Act.  To state a claim for a violation of the CFRA, a plaintiff must allege that there was a "contract or agreement, express or implied, in which the purported franchisee meets three criteria," and that the franchisor committed some act prohibited by CFRA, such as terminate the relationship without cause.  *See Gabana Gulf Distrib., Ltd. v. GAP Int'l Sales, Inc.*, 2006 WL 2355092, at *7 (N.D. Cal. Aug. 14, 2006) (Breyer, J.).  The three criteria for a franchisee under the CFRA are (1) the franchisee is granted the right to engage in the business of offering, selling or distributing goods or services under a marketing plan or system prescribed in substantial part by a franchisor, (2) the operation of the franchisee's business pursuant to that plan or system is substantially associated with the franchisor's trademark, service mark, trade name, logotype, advertising, or other commercial symbol designating the franchisor or its affiliate, and (3) the franchisee is required to pay, directly or indirectly, a franchise fee.  Cal. Bus. & Prof. Code 20001.

In its motion to dismiss, BRTI correctly asserts that a failure to satisfy any of the three criteria is fatal to a claim under CFRA (Br. 13).  That said, the only issue at this stage is whether a party is required to plead the specific criteria constituting a franchise in order to state a claim under CFRA.  Under *Ashcroft v. Iqbal*, the Supreme Court noted that "[w]hile legal conclusions can provide the complaint's framework, they must be supported by factual allegations."  129 S.Ct. at 1940.  Under this standard, PTC must provide at some *some* factual allegations to support an inference that it is a franchisee within the meaning of CFRA, and that BRTI violated the CFRA.

In its counterclaim, PTC simply stated that its relationship with BRTI "is a 'franchise' within the meaning of the California Franchise Relations Act § 20000 et seq.," and that BRTI's termination of the relationship without cause violated the CFRA (Ans ¶¶ 123–124).  No facts, however, are alleged *anywhere in the answer* that give rise to a reasonable inference that BRTI substantially prescribed a marketing plan or system for the distribution of its beers.  Indeed, to the contrary, PTC states that BRTI's predecessor-in-interest "did not support [PTC]'s efforts to build the Singha brand in the United States at all," and that "[PTC] has created a market for Boon Rawd Products . . . in the United States: (Ans. ¶¶ 8-9).  Additionally, nowhere in the answer is it alleged that PTC paid, directly or indirectly, a franchise fee.  In light of these factual deficiencies, BRTI's motion to dismiss counterclaim eight must be **GRANTED**.  Accordingly, PTC's eighth counterclaim is **DISMISSED**.

### CONCLUSION

For the reasons set forth above, BRTI's motion to dismiss PTC's seven counterclaims is **GRANTED IN PART** and **DENIED IN PART**.  The hearing scheduled for this motion is hereby **VACATED**.  PTC may file a motion seeking leave to amend their counterclaims — attaching the amended pleading thereto — **BY NOON ON THURSDAY, MARCH 4, 2010**, explaining why the amended counterclaims properly state claims for relief.

**IT IS SO ORDERED.**

Dated: February 19, 2010.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE

21